FILED
07/26/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2017 Session

**IN RE  CONNER F.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 258891   Robert D. Philyaw, Judge**

_____

**No. E2015-02502-COA-R3-JV**

_____

This appeal concerns issues of custody and support of a minor child born in Colorado, but now residing in Tennessee.  After determining that jurisdiction was proper in Tennessee, the trial court designated the mother, a resident of Tennessee, the primary residential parent and adopted her proposed parenting plan.  Child support for the father, a resident of Colorado, was set at $1,017 per month.  An arrearage balance of $23,428.38 was ordered paid at the rate of $200 per month until paid in full.  The father appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J., joined.

Philip M. Jacobs, Cleveland, Tennessee, for the appellant, Justin F.

Jennifer K. Peck, Chattanooga, Tennessee, for the appellee, Amanda Christine K.

**OPINION**

**I.  BACKGROUND**

The parties met while Amanda Christine K. ("Mother") was residing in Hamilton County, Tennessee and making trips to work at the Ocoee River on the weekends, where Justin F. ("Father") was living and working.  The parties moved to Colorado in 2011.  They were unmarried at the time of the birth of their child, Conner ("the Child") in November of 2012, and have remained unmarried.  According to Father, he was the

Child's initial primary caregiver for approximately four months while they lived in Colorado. In March 2013, Mother and Father moved in with the maternal grandmother in Tennessee. Two months later, Father moved to Costa Rica. Mother and the Child resided exclusively in Hamilton County with maternal grandmother until June 2013, at which time they joined Father in Costa Rica.

Prior to moving to Costa Rica, Father registered his vehicle and a trailer in Tennessee, and after only three months out of the country, Mother and Father returned to Tennessee with the Child. On December 7, 2013, however, Mother and Father mutually agreed to terminate their relationship. Mother and the Child continued living with maternal grandmother until Mother purchased a Hamilton County home in October 2014.

After the breakup, Mother claims that Father became aggressive and ordered maternal grandmother to unwrap the Christmas presents Father had purchased for the Child so that he could take them with him. According to Mother, Father insisted that if the presents were not unwrapped and returned to him, he would have Mother arrested for theft, take the Child, and be back in Colorado with the Child before Mother could get out of jail. After ultimately leaving for Colorado without the Child, Father did not return to see his son until July 2, 2014. During this period of time, Father made trips to Florida from Colorado, but stated that a side trip to see the Child during a trip to Florida "would be 10 or more hours out of my way."

Once he returned to Colorado, Father filed a Petition for Allocation of Parental Rights in the District Court of La Plata County, Colorado, which was verified on December 12, 2013. Mother thereafter filed a petition for child custody in Tennessee on January 3, 2014. At the time of her petition, Mother and the Child had been residing in Hamilton County for six of the previous thirteen months, and the majority of the Child's life. Mother was employed in Tennessee and had no plans to leave the state. Father moved to dismiss Mother's petition, but he acknowledged that the Child "had no other state of residence and has lived in no state for 6 or more consecutive months." On March 12, 2014, the Hamilton County Juvenile Court Magistrate ("the Tennessee Magistrate") issued an order stating the necessity for the court to hear proof to determine which court should take jurisdiction over the case.

On April 11, 2014, the Colorado court issued an order on Mother's Motion to Dismiss Due to Inconvenient Forum, determining that it was appropriate for Tennessee to exercise jurisdiction. The Colorado court relied on its discussion with the Tennessee Magistrate pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").[1] The Colorado court concluded that "there was no home state" for the

---

[1]Tenn. Code Ann. §§ 36-6-201 to -243. The UCCJEA, promulgated in 1997 by the National Conference of Commissioners on Uniform State Laws, is a detailed jurisdictional statute that "establishes standards for the initial entry of child custody determinations that will be entitled to

Child, that "the [C]hild ha[d] resided in Tennessee for nearly seven months, since returning from Costa Rica," and that "the [C]hild resided in Colorado for only four months." In addition, the court determined that "[t]he distance between Tennessee and Colorado [was] large and [Father was] more able to bear the cost of traveling between jurisdictions." Further, the court found that "[t]he nature and location of evidence required to resolve the pending litigation weigh[ed] in favor of Tennessee exercising jurisdiction," that Mother was receiving state assistance from the State of Tennessee, and that Tennessee had the jurisdiction to decide both custody and support issues. The Colorado court applied the factors listed in Colorado Revised Statutes section 14-13-207 to rule that Colorado was an inconvenient forum and that Tennessee could better resolve all matters at issue.[2]

On April 21, 2014, the Tennessee Magistrate found that there was no home state of the Child and that the concept of "extended home state jurisdiction" did not apply to the facts of this case. The court announced:

> After having considered the length of time the [C]hild has resided outside the state of Colorado; the relative financial circumstances of the parties; the distance between the two states; and the fact that this Court is no less familiar with the facts and issues to be considered, this Court is willing to assert jurisdiction in the matter. Further this state has provided financial benefits on behalf of the [C]hild, giving it vested interest in the financial responsibilities of the respective parents.
>
> Having conferred with [the Colorado judge], it is apparent Tennessee is a more convenient forum and the matter will be set for hearing in this Court.

On July 23, 2014, the Tennessee Magistrate issued an order sustaining Mother's petition for custody and designating Mother the primary residential parent. The court adopted Mother's proposed parenting plan, which provided for Father to visit with the Child in Tennessee. The court noted in its findings and recommendation:

> The court has concerns regarding the Father's continued financial stability in that he is unable to obtain a credit card

---

full faith and credit in all fifty states as a matter of federal law." *Staats v. McKinnon*, 206 S.W.3d 532, 544 (Tenn. Ct. App. 2006). The UCCJEA became effective in Tennessee on June 14, 1999. 1999 Tenn. Pub. Acts, ch. 389, §§ 1-46.

[2]The Colorado court ordered Father to pay $5,000 in attorney fees to Mother.

- 3 -

and has had to use the mother's credit cards for his business expenses. However, the Father is in a better position at present to handle the costs of transportation for parenting time. *Fairness seems to suggest that the cost of transportation to and from Colorado should form the basis for downward deviation in the Father's child support obligations.*

(Emphasis added.)

Father filed a timely request for rehearing. In text messages to Mother, Father stated, "I will continue taking you to Court over everything until Conner is eighteen." In addition, Father advised Mother that he would request that she be responsible for 50 percent of his travel and lodging and the travel expenses of his witnesses. He further told her that the child support she would receive would be reduced and that "travel and lodging has already added up to you being responsible for at least a couple thousand dollars."

The juvenile court trial was held March 11, May 22, and August 31, 2015. Regarding the issue of travel expenses, Mother testified to her inability to make trips to Colorado based on her work limitations and her limited financial circumstances. In contrast, Father, when asked what he did for a living, responded: "Very little, fortunately." Father continued: "But for the most part, to be honest with you, I play in my garden and field phone calls." Concerning the travel expenses, Father testified:

A: My perspective was that I -- you know, I have been spending so much money traveling back and forth to see my son that I thought that, you, know, the Court would take what I was spending in travel expenses toward the child support.

Q: How do your travel expenses provide her housing, food, things like that for your child?

A: They don't.

Q: Okay. But you expected the Court to say that since you're paying travel expenses, you didn't have to pay child support?

A: Yes, ma'am.

Father requested that the court credit him for mileage in the amount of $2,451 for July 2014, and $1,995 each month from August through November 2014, despite his acknowledgment that the maximum cost would be approximately $1,000 roundtrip. For

December 2014, Father sought credit in the amount of $3,026.14 ($1,656.40 for airfare), despite previously testifying that roundtrip flights were approximately $500. Father acknowledged that "I'm often purchasing my flights last minute." Father also admitted that he typically rented a Sport Utility Vehicle during his trips to Chattanooga, including a Suburban. Father claimed that he paid his friend's parents $300 to stay at their home in July 2014, but he could not produce a receipt to reflect the stay.

Mother responded that flights were only approximately $400 if booked in advance and that Father largely wrote his personal expenses off as a business expense. In addition, maternal grandmother testified that Father inquired about talking with the maternal grandfather to discuss how to hide funds when one owns his own business.

In 2011, Father asserted that he earned approximately $80,000, and that he netted up to $2,000 per truck at his business (approximately seven trucks). In 2013, he declared to maternal grandmother that he had reached his goal of earning $100,000 per year. In addition, Father's roommate paid him $700 per month toward rent and he wrote off half the rent as a business expense. However, Mother's requests for child support were challenged: "[W]hat are u needing cash for? U saw the Walmart card was for $75. . . . His every need can be filled by items purchased from Walmart. . . ." From December 2014 to February 2016, Father only paid a total of $3,100 in child support, including some credit for the Walmart gift cards. Father only provided support 8 out of 15 months.

Father acknowledged gross receipts for his company in 2013 from one vendor of $368,814.06 and paying himself a substantial amount during that time. After 2013, however, Father claimed that he had to cut back what he was paying himself because things started getting "rough." He could not explain, however, the 1099 from one vendor in 2014 in the amount of $842,943.51 if the reason he cut back his payments to himself resulted from business difficulties. Father also maintained 2 horses, 130 chickens, and 30 ducks.

Father filed with the Colorado court a signed and notarized Self-Employed Party's Sworn Statement reflecting that he earned $5,000 per month. At trial, however, Father asserted that he only earned approximately $3,200 per month. Father's bank statements showed $5,400 deposited into his personal account in February 2014. Deposits for the following months were as follows: March $6,900; April $7,000; July $3,200. Father went from an average of $6,500 per month to exactly $3,200 the same month that the child support hearing was held. Further, Father had spent thousands of dollars at restaurants, dive shops, bait shops, and trips to Florida out of the business account. He admitted that expenses he had claimed for the Child each month were not true.

On September 10, 2015, the trial court issued a memorandum opinion regarding all issues in this case. The court upheld the decision of the Tennessee Magistrate that designated Mother as the primary residential parent and adopted Mother's proposed

permanent parenting plan. The court found that "[t]he parties met while working in Tennessee . . . approximately eight years ago" and that they subsequently resided in Tennessee, Colorado, and Costa Rica. The child resided solely with Mother in Tennessee from March 15, 2013, to June 5, 2013, before going to Costa Rica for a few months. "Mother and child never returned to Colorado to live," and "[t]he child has lived all but 275 days of his life in Tennessee." The parties registered a vehicle and other personal property in Tennessee prior to their trip to Costa Rica. "[T]here is also some indication that Tennessee has provided financial benefits on behalf of the child, thus giving it a vested interest in the financial responsibilities of the respective parents." The court also concluded that there is not a home state of the Child, but that the Child has resided outside of Colorado for a considerable length of time, that "Tennessee is a more convenient forum," and that the parties have substantial connections with Tennessee. The court further found it significant that Mother owned her own home in Hamilton County and the Child had strong relationships with local family members. Accordingly, the court determined that it had jurisdiction over this matter.

Regarding the financial issues of the parties, the court observed that "Father abused his financial relationship with Mother" by excessively using her credit cards for his business, leaving her in debt. The court further noted that although Father now "bragged about having a lot of income and spending like someone who has a lot of income, he claim[ed] to be limited in his ability to pay child support." Based on the evidence and testimony, the trial court set Father's income at $5,000 per month. The court concluded that Father had a child support arrearage balance of $23,428.38 as of September 1, 2015, to be paid at a rate of $200 per month until fully satisfied. Father's child support was set at $1,017 per month, beginning October 1, 2015. The court agreed with the Tennessee Magistrate that fairness may require a downward deviation for Father's travel expenses in the future, but no credit on Father's child support arrearage or current support obligation was proper at this time. Father filed a timely appeal.

## II. ISSUES

Father raises the following issues in this appeal:

1. Jurisdiction properly rested with Colorado rather than Tennessee because Tennessee was not the Child's home state at the time the legal proceedings was commenced;

2. The trial court erred in setting child support when the court did not have personal jurisdiction over Father.

3. The trial court erred in failing to grant a downward deviation under the child support guidelines based upon the

significant travel expenses incurred to visit the Child.

4. The trial court improperly calculated Father's income for determining child support.

### III. STANDARD OF REVIEW

We review the trial court's conclusions of law de novo, with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). In reviewing any findings of fact made by the trial court without a jury, we review the trial court's factual findings de novo "accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005).

Statutory interpretation is a question of law, so the questions concerning the trial court's assertion of jurisdiction in Tennessee and assertion of personal jurisdiction over Father in Tennessee will be reviewed de novo. *Mills v. Fulmarque*, 360 S.W.3d 362, 366 (Tenn. 2012).

Trial courts have the opportunity to hear and see the witnesses testify and, therefore, are normally in the best position to judge their credibility. *Masengale v. Masengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). Consequently, this court accords great weight to the trial court's determination of credibility. *Gaskell v. Gaskill*, 936 S.W.2d 626, 633 (Tenn. Ct. App. 1996), and we routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996).

"In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines" that are promulgated by the Tennessee Department of Human Services Child Support Service Division. Tenn. Code Ann. § 36-5-101(e)(1)(A). The setting of child support is a discretionary matter we review using the deferential "abuse of discretion" standard of review, which requires the court "to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

## IV. DISCUSSION

### a.

The UCCJEA governs jurisdiction between Tennessee and other states when a child custody proceeding is instituted. *Button v. Waite*, 208 S.W.3d 366, 369 (Tenn. 2006). In the UCCJEA, "home state" is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six (6) months of age, 'home state' means the state in which the child lived from birth with any of the persons mentioned . . . ." Tenn. Code Ann. § 36-6-205(7): It is undisputed that the Child was born in Colorado; however, he resided there for less than six months. Both parents then moved to Tennessee. First, Mother and Father moved in with the Child's maternal grandmother in Hamilton County for approximately three months. While living in Tennessee, the parties registered personal property here, including Father's vehicle. Next, Mother left the country, living in Costa Rica for three months with the Child. Upon the return of Mother and the Child from Costa Rica, the parties resumed their residence with the Child's maternal grandmother. Mother and Father decided to end their relationship three months after returning from Costa Rica. Mother remained with the Child in Tennessee.

Upon Father's filing for custody in Colorado and Mother's filing for custody in Tennessee, Colorado declined to exercise jurisdiction in this case. The Tennessee court found that this state is a more convenient forum.

Tennessee Code Annotated section 36-6-216(a)(2) states, in relevant part, that courts in Tennessee have jurisdiction to make initial custody determinations when:

> [A] court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under §§ 36-6-221 or 36-6-222, and:
>
> (A) The child and the child's parents, or the child and at least one (1) parent . . . have a significant connection with this state other than mere physical presence; and
>
> (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships . . . .

Tenn. Code Ann. § 36-6-216(a)(2).

It is established that: (1) a minor child lacks the capacity to change his own

domicile; (2) domicile of a minor child is controlled by that of the person charged with his legal care and custody; (3) whenever the domicile of a parent having custody changes, the minor's domicile necessarily follows it; and (4) the domicile of a minor child residing with its mother follows the domicile of the mother. *Parrott v. Abraham*, 146 S.W.3d 623, 628 (Tenn. Ct. App. 2003) (internal citations omitted). Further, to change domicile or legal residence, a mother must actually change her residence, desire to abandon her old domicile, and intend to establish a new domicile at a new residence. *Id.* It is "the intention of the person at the time of arrival at the new residence which is most important in determining domicile." *Id.* (internal citations omitted). As long as physical presence in the locality and an intention to acquire a domicile there occur concurrently, the length of residence is not a factor in the establishment of domicile. *Id.* Finally, "when both parents leave the 'home state,' it loses its status in favor of such new domicile as is established for the child." *Id.* at 624 (internal citations omitted).

The Child's domicile is dependent upon Mother's because she maintained custody of him throughout the relevant time period. Mother's move to Tennessee in March 2013 is the correct date for her change in domicile. Mother and Father's registry of property in Tennessee establishes a preponderance of the evidence that they intended to abandon their residence in Colorado and become domiciled in Tennessee. Colorado lost it favor as the home state to Tennessee when both parents left Colorado with the intention of changing their domicile.

Furthermore, Colorado declined to exercise jurisdiction over this matter, and the Child and Mother had a significant connection with Tennessee due to Mother changing her domicile to this state. There is also substantial evidence in Tennessee concerning the Child's care, protection, training, and personal relationships. The preponderance of the evidence supports the trial court's determination that Tennessee correctly asserted jurisdiction in this matter.

b.

Father did not enter any filing that objected to Tennessee's jurisdiction until he filed an official answer on July 23, 2014. In the intervening period, his counsel filed many motions on Father's behalf, having the effect of entering his appearance. According to Tennessee Code Annotated section 36-5-2201(a)(2), "[t]he individual submits to the jurisdiction of this state by consent in a record, by entering a general appearance, or by filing a responsive document having the effect of waiving any contest to personal jurisdiction." Father waived any objection he had to the court exercising personal jurisdiction over him when his attorney failed to enter a restrictive appearance for purposes of determining jurisdiction.

Additionally, pursuant to Tennessee Code Annotated section 71-3-124(a)(1):

> Each applicant or recipient who received or authorizes payment of public or temporary assistance pursuant to Title IV-A or Title IV-E of the Social Security Act, compiled in 42 U.S.C. §601, et seq. and 42 U.S.C. §670, et seq., respectively, or any successor program providing temporary assistance or foster care or adoption assistance shall be deemed to have assigned to the state any rights to support from any other person such applicant or recipient may have: (A) In the applicant's own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid; and (B) That have accrued at the time such assignment is executed.

According to Tennessee Code Annotated section 71-3-124(a)(3), "[d]uring the terms of such assignment, the department shall be subrogated to the rights of the child or children or the person having custody to collect and receive all child support payments."

In this case, Mother was receiving public assistance at the time that she filed her petition for custody and requested the court to set support. Upon receipt of public assistance, Mother was deemed to have assigned her rights to recover child support to the State of Tennessee. Thus, Tennessee has a vested interest in assisting Mother to receive child support from Father.

Father actively availed himself of the courts in Tennessee without objection to personal jurisdiction. In addition, Father had substantial ties to Tennessee, having lived for at least three months in Tennessee after returning from Costa Rica, and having registered property in the state prior to leaving for Costa Rica. The court properly assessed the facts of this particular case and determined that the requisite affiliating circumstances were present to assert personal jurisdiction over Father.

c.

The purpose of the child support guidelines, first promulgated in 1988, is to assure that children receive support reasonably consistent with their parents' financial resources. *Kaatrude*, 21 S.W.3d 244 at 49. The amount of child support calculated under the guideline formula is presumptively correct. Tenn. Comp. R. & Regs. 4. 12140-2-4-.02(7). The obligor parent's income is the most important variable in setting child support. *Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995).

Pursuant to the guidelines:

> The tribunal may order as deviation an amount of support

different from the amount of the presumptive child support order if the deviation complies with the requirements of this paragraph (1) and with this chapter. The amount or method of such deviation is within the discretion of the tribunal provided, however, the tribunal must state in its order the basis for the deviation and the amount the child support order would have been without the deviation. In deviating from the Guidelines, primary consideration must be given to the best interest of the child for whom support under these Guidelines is being determined.

Tenn. Comp. R. & Regs. 1240-02-04.07(1)(b). The guidelines further emphasize the purely discretionary language of the section above by stating that, "If parenting time-related travel expenses are substantial due to the distance between the parents, the tribunal may order the allocation of such costs by deviation from the PCSO [Presumed Child Support Obligation], taking into consideration the circumstances of the respective parties as well as which parent moved and the reason that the move was made." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(c).

In this case, the trial court acknowledged that there may be substantial travel expenses related to the exercise of parenting time on the part of Father. However, the court determined that a downward deviation was not appropriate at the time based upon the relevant financial situation, employment obligation, and ease of travel or lack thereof for both parties. Significantly, the court properly took into consideration Father's voluntary decision to live in Colorado. *See* Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(c); *Long v. Long*, No. M2006-02526-COA-R3-CV, 2008 WL 2649645, at *12 (Tenn. Ct. App. July 3, 2008). The trial court had the opportunity to hear and see the witnesses testify and, therefore, was in the best position to judge their credibility. *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, we decline to second-guess the trial court's determinations without sufficient proof. *Thompson*, 936 S.W.2d at 957. We find no abuse of the court's discretion in its ruling on this issue.

d.

Appellate courts review child support decisions using the deferential abuse of discretion standard. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "We will not reverse the trial court's decision unless we determine it is clearly unreasonable based on the facts of the case and the applicable law." *Yates v. Yates*, No. M2015-00667-COA-R3-CV, 2016 WL 748561, at *11 (Tenn. Ct. App. Feb. 24, 2016); *see Richardson*, 189 S.W.3d at 725.

In determining a parent's income for the purpose of setting child support, the guidelines provide:

[The] gross income of each parent shall be determined in the process of setting the presumptive child support order and shall include all income from any source (before deductions for taxes and other deductions such as credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following: wages; salaries; . . . income from self-employment; bonuses; . . . Interest income; Dividend income; trust income. . . .

Tenn. Comp. R. & Regs. 1240-02-04.04(3)(a)(1). In addition, the court may consider "a parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent." Tenn. Comp. R. & Regs. 1240-02-04.04(3)(a)(2).

The record reflects that Father gave many different sworn statements about his monthly income. Specifically, Father claimed that he earned approximately $80,000 in 2011, and then asserted to maternal grandmother while in Costa Rica in 2013 that he had reached his goal of earning $100,000 per year. He also stated that he was earning approximately $14,000 per month from his trucking business, in addition to the rent of $700 his roommate paid him per month. In a sworn document provided to the State of Colorado, Father claimed that he made $5,000 per month. In yet another sworn oath, Father claimed that he only earned $3,200 per month.

Father's bank statements revealed that he went from an average of $6,500 per month to exactly $3,200 the same month that the first child support hearing was held. The court also heard testimony regarding the thousands of dollars Father spent on restaurants, dive shops, bait shops, and trips to Florida out of Father's "business account." Additionally, Father had horses and other livestock inconsistent with a limited income. Further, Father maintained exorbitant travel expenses, including last minute flights and SUV rentals while visiting the Child. His testimony that he paid his operations manager the same amount he paid himself also does not align with a business owner who travels and spends excessively.

Based on all of the evidence and testimony, the trial court set Father's income at $5,000 per month. Father contends that the court did not make the requisite findings to explain how it reached this amount. He urges recalculation of child support based upon his actual income.

We find no abuse of discretion in the trial court's calculation of Father's gross income. We have previously held that "gross income" is not limited to the income shown on a parent's tax return. *See Wade v. Wade*, 115 S.W.3d 917, 922 (Tenn. Ct. App. 2002). The trial court made the requisite findings of fact with sufficient evidentiary foundation

and reached a decision that was well within the range of acceptable alternatives.

## V.  CONCLUSION

The decision of the juvenile court is affirmed and the cause is remanded pursuant to applicable law, for the collection of costs assessed below.  Costs on appeal are assessed against the appellant, Justin F.

_____
JOHN W. MCCLARTY, JUDGE